## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

REGINA M. WAGNER,

         CASE NO. 15-11553

   *Plaintiff*,     DISTRICT JUDGE DENISE P. HOOD

*v.*          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

   *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 17, 18)

## I.  RECOMMENDATION

  In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Wagner is not disabled. Accordingly, **IT IS RECOMMENDED** that Wagner's Motion for Summary Judgment (Doc. 17) be **DENIED**, that the Commissioner's Motion for Summary Judgment (Doc. 18) be **GRANTED**, and that this case be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

  Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq*. and the Supplemental Security Income ("SSI") program of

Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 6; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 18).

Plaintiff Regina Wagner was thirty-seven years old as of January 13, 2010, her amended date of alleged disability. (Tr. 14). Her applications for benefits were initially denied on March 9, 2012. (Tr. 46-60). Wagner requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ John J. Rabaut on September 10, 2013. (Tr. 25-45). Wagner, represented by attorney Jordan Leming, testified, as did vocational expert ("VE") Diane Regan. (*Id.*). On January 10, 2014, the ALJ issued a written decision in which he found Wagner not disabled. (Tr. 9-19). On October 21, 2014, the Appeals Council denied review. (Tr. 1-3). Wagner filed for judicial review of that final decision on April 29, 2015. (Doc. 1).

## B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . .

3

physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

**D.     ALJ Findings**

Following the five-step sequential analysis, the ALJ found Wagner not disabled under the Act. (Tr. 19). The ALJ found at Step One that Wagner had not engaged in substantial gainful activity following the alleged onset date, January 13, 2010. (Tr. 14). At Step Two, the ALJ concluded that Wagner had the following severe impairments: "scoliosis; cervical and lumbar degenerative disc disease/osteoarthritis; right ulnar neuropathy; and history of tobacco abuse." (Tr. 15). At Step Three, the ALJ found that Wagner's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 15). The ALJ then found that Wagner had the residual functional capacity ("RFC") to perform light work, except that Wagner "cannot climb ladders, ropes or scaffolds . . . can occasionally climb ramps and stairs . . . can occasionally balance, stoop, kneel, crouch, and crawl . . . [and] should avoid all exposure to unprotected heights." (Tr. 15). At Step Four, the ALJ found that Wagner was able to return to her past relevant work as either a housekeeper or cashier. (Tr. 19). As a result, the ALJ found Wagner not disabled under the Act. (Tr. 19).

**E.     Administrative Record**

**1.     Medical Evidence**

In November 2004 Wagner complained of back pain; an MRI showed evidence of thoracic radiculopathy, along with scoliosis and degenerative disc disease. (Tr. 286).

Wagner again sought treatment for chronic back pain in October 2009. (Tr. 237). In November 2009 Wagner underwent a neurology consultation with Dr. Demian

5

Naguib. (Tr. 264). Wagner complained of low back pain extending into the left lower extremities, along with midthoracic pain extending into the shoulders bilaterally. (*Id*.). She rated her pain as eight out of ten. (*Id*.). In December 2009 Wagner was informed that, on a periodic basis, she should not drive, due to her medical conditions. (Tr. 267).

Wagner underwent a CT scan of her lumbar spine in January 2010; it was noted that she had a history of scoliosis. (Tr. 231). The scan revealed multilevel disc bulges with mild anterior thecal sac compression, no evidence of canal stenosis, and some hard calcification within the longitudinal ligament posterior to the T11/12 level, with mild anterior thecal sac compression. (*Id*.). Also in January 2010 Wagner visited several times with Dr. Naguib, who diagnosed low back pain syndrome, spondylosis, disc disease, and radiculopathy, along with muscle spasms and joint osteoarthritis. (Tr. 368-75). Dr. Naguib administered an epidural steroid injection. (*Id*.). Dr. Naguib performed a needle electromyography ("EMG") study which revealed no significant findings. (Tr. 375).

In March 2010 Dr. Naguib found that Wagner was suffering from low back pain syndrome, spondylosis, and radiculopathy; she experienced a thirty to fifty percent improvement in her pain from the use of an epidural steroid injection. (Tr. 361). Later that month Dr. Naguib wrote that Wagner received a sixty-percent reduction of her pain from the administration of an epidural steroid injection. (Tr. 353-54).

In July 2010, Dr. Naguib recorded complaints of low back pain, and found evidence of degenerative disc disease and spondylosis. (Tr. 348). He performed an epidural steroid injection. (*Id*.).

6

In August 2010 Wagner reported to Dr. Naguib that pain reliving injections helped to reduce her pain to a "mild" level. (Tr. 279). During another visit that month, Dr. Naguib performed an epidural steroid injection for the treatment of Wagner's intractable low back pain, lumbar facet spondylosis, degenerative disc disease, and spondylosis. (Tr. 340). Later that month, Dr. Naguib performed an EMG test which revealed normal results in all muscle groups, without evidence of acute radiculopathy, plexopathy, or myopathy. (Tr. 328). Dr. Naguib concluded that Wagner's pain was "mainly because of lumbar degenerative disk disease with picture of facet joint spondylosis." (*Id*.).

In October 2010, Dr. Naguib found that an epidural steroid injection provided Wagner with fifty-percent improvement in her back pain for three weeks, but that the pain returned and felt "bilateral, dull, deep." (Tr. 322). Wagner's pain was "aggravated by rest," twisting, extension, or rotation, but was relieved by flexion. (Tr. 323). A lumbar facet joint block was performed to relieve pain resulting from facet joint spondylosis. (*Id*.).

In February 2011 Dr. Naguib recorded complaints of chronic back pain that radiated into the posterior of the lower extremities, discogenic pain, facet arthrosis, disc bulges as L5/S1 and L4/L5. (Tr. 308). Dr. Naguib prescribed the narcotic pain reliever Norco and suggested epidural steroid injections. (Tr. 309).

In March 2011 Dr. Naguib noted chronic and intractable back pain, degenerative disc disease, along with a disc bulge in the L5/S1 and L4/L5 region. (Tr. 299). A lumbar epidural steroid injection was performed. (*Id*.). Dr. Naguib noted that Wagner's urine was

7

positive for marijuana, but was negative for Norco, showing that she was apparently not taking her pain relieving medication.[1] (Tr. 300). Later that month, Wagner reported a forty-percent improvement in her pain since her last injection, but reported that her leg pain caused sleep issues, that she experienced neuropathy in her arms, and pain in her neck. (Tr. 302).

In June 2011 Dr. Naguib noted complaints of "[c]hronic widespread fibromyalgiac myofascial pain syndrome," "bilateral lower extremity tingling, numbness and paresthesia with bilateral upper extremity tingling, numbness and paresthesia," along with "[t]horacic degenerative disc disease," migraine, and occipital neuritis. (Tr. 294). Dr. Naguib recorded that the narcotic pain reliever Norco was not helping Wagner, thus she was switched to Vicodin. (*Id*.). Wagner complained of chronic, severe neck pain, which was constant, increased by activity, and decreased by use of a TENS unit and medications. (*Id*.). Wagner had "5/5 strength in all 4 extremities," but had "trigger point tenderness" and "tenderness on palpation of the thoracic area and cervical area." (*Id*.). Wagner's diagnosis was of chronic thoracic pain, thoracic degenerative disc disease, cervical and lumbar sprain, tingling and numbness in all extremities, migraine, and fibromyalgia myofascial pain syndrome. (Tr. 295).

Dr. Naguib performed two EMG studies in August 2011, again showing no significant findings. (Tr. 460, 482).

---

[1] Wagner again tested negative for Norco in May 2012 and January 2013, again indicating that she was not taking her pain relieving medication as directed. (Tr. 418, 543).

8

Between December of 2009 and December 2011, Wagner reported several times that she experienced pain around seven out of ten in severity, that "everything" made the pain worse, that the pain was centralized in her neck, shoulders, and lumbar spine, and that the pain radiated into her leg and hips. (Tr. 275-85). She reported that use of a TENS unit helped to relieve her pain. (Tr. 278, 282). Wagner continued to report somewhere in the range of six to eight out of ten pain through 2013. (*See*, *e.g.*, Tr. 528, 533).

In February 2012 Wagner received a consultative examination from Dr. Scott Lazzara regarding her back pain; it was noted that she was taking narcotic pain medication multiple times per day under the care of Dr. Naguib for treatment of her back pain. (Tr. 242). Wagner reported some numbness in her legs after sitting for long periods, along with some complaints associated with fibromyalgia. (*Id*.). She reported being able to drive short distances, babysit for her daughter-in-law, shop for groceries, climb stairs, sit or stand for ten minutes, walk a mile, lift twenty pounds, and sew clothing. (*Id*.). Wagner could get on and off the examination table without issue, could walk on heel and toe, squat, and hop. (Tr. 243). She showed some signs of thoracic kyphosis and scoliosis in the cervical and thoracic spine, along with tenderness in the thoracic and lumbar spine. (*Id*.). Her range of motion was essentially normal. (Tr. 244-45). Consultative examiner Dr. Scott Lazzara concluded that Wagner's 2010 CT scan showed signs of multilevel disc herniations, but that her "symptoms appear to be more arthritic and myofascial pain." (Tr. 246). Wagner was "not undergoing any treatment now other than pain management, and range of motion exercises . . . possibly injection treatments may be of additional benefit."

9

(*Id*.). Dr. Lazzara also noted that Wagner was "at risk of further deterioration over time due to the nature of her abnormality." (*Id*.). Wagner could perform all tested activities, including sitting, standing, stooping, carrying, pushing, pulling, picking up coins and pencils, squatting, and climbing. (Tr. 247). He ultimately assessed that her prognosis was "fair," and that her "degree of impairment appears mild, but not remediable." (Tr. 246).

In May 2012, Dr. Naguib completed a RFC questionnaire, in which he asserted that Wagner could frequently lift up to ten pounds, could occasionally lift twenty pounds, but could never lift fifty pounds. (Tr. 251). That form contains no explanation of her symptoms or the maladies causing her symptoms.  Dr. Naguib noted signs of chronic widespread fibromyalgic myofascial pain syndrome, bilateral tingling in the lower extremities, numbness, paresthesia, thoracic degenerative disc disease, migraine, and occipital neuritis. (Tr. 426). Dr. Naguib also found that Wagner had "been very compliant with her medication treatment program." (*Id*.). Wagner reported that the pain relieving injections "helped her very much with her back pain and leg pain." (*Id*.).

Notes throughout the record indicate that Wagner received pain relieving injections regularly in 2010, 2011, 2012, and 2013. (Tr. 272). (Tr. 404, 413. 414. 416. 417. 434. 437. 441. 444. 448. 452. 456. 459, 487, 488, 510, 513, 516, 517, 520, 521, 523, 524, 529, 530, 534.) Wagner regularly reported that these injections provided substantial relief, but did not totally or permanently resolve her pain. (Tr. 487).

In September 2012 Wagner reported that her pain generally interfered with her daily activities at the level of seven out of ten. (Tr. 268-69). Dr. Naguib performed an

10

occipital ridge injection in an attempt to remedy Wagner's neck pain and an injection at the iliac crest to remedy her low back pain. (Tr. 395).

In December 2012 Wagner again complained of chronic pain in the neck, back, and legs, stating that "everything causes pain" but that her pain was constant and worse at night. (Tr. 270). Wagner also reported midthoracic, shoulder, and leg pain in December 2012. (Tr. 266).

Dr. Naguib drafted another RFC assessment in January 2013, wherein he found that Wagner suffered from back tenderness and pain, headaches, fatigue, and confusion, and that these symptoms would "frequently" interfere with her ability to work. (Tr. 253). He wrote that Wagner could walk less than one block, could sit or stand for fifteen minutes at a time comfortably, and could perform the same tasks for one hour per day each. (*Id.*). Wagner would require a job that permitted her to shift postural positions at will, and would need unscheduled breaks "as needed" for ten minutes at a time. (*Id.*). Dr. Naguib revised his weight restrictions such that Wagner could lift ten pounds occasionally but could never lift more than ten pounds. (Tr. 254). Wagner had limitations in reaching, handling, and fingering, and could perform those activities at most seventy percent of the time. (*Id.*). Finally, Dr. Naguib found that Wagner would be absent from work three to four times per month. (*Id.*).

In March 2013 Dr. Naguib again noted chronic back pain, lumbar degenerative disc disease, lumbar displaced disc disease, generative changes of the low thoracic spine, widespread fibromyalgia and myofascial pain syndrome, multilevel disc bulge with mild

11

degree of anterior thecal sac compression at L4/L5 and L5/S1, hard calcification at T11/T12, bilateral lower extremity pain, multiple widespread muscle pain syndromes, chronic neck pain and cervicalgia, paraspinal muscle spasms and myalgia, bilateral sacroiliitis, insomnia caused by pain, progressive cervical pain and cervical radiculopathy. (Tr. 526).

In September 2013 Dr. Naguib drafted yet another RFC assessment, asserting that Wagner could walk only half a block without rest, could sit, stand, or walk for fifteen to twenty minutes, but could sit for three hours per day, could stand or walk for four hours per day, required a job which permitted her to shift positions at will, and would need breaks every fifteen to twenty minutes for ten to fifteen minutes each. (Tr. 591). He also revised upward Wagner's lifting ability, finding that she could lift up to twenty pounds occasionally, but could never lift fifty pounds. (*Id*.). He wrote that Wagner was limited in her ability to use her hands, fingers, and arms, but also recorded that she could use her hands or fingers 100% of the time, but left the "arms" field blank as to both the left and right arm. (*Id*.). He also wrote that Wagner would miss work more than four times monthly due to uncontrolled headaches, and could not work a normal eight-hour day because of tailbone pain from sitting. (Tr. 592).

In October 2009 Wagner treated with Dr. Seema Dohi, complaining of "chronic onset lower back pain," which was worse with movement or bending, but with no radiation of pain into the legs, no tingling, and no numbness. (Tr. 578). Dr. Dohi diagnosed chronic back pain, and left sided spinal radiculopathy. (Tr. 578-79).

12

In June 2010 Wagner treated with Dr. Seema Dohi, complaining of rashes and sinus pain, but apparently was not suffering from any other maladies. (Tr. 507).

In July 2012 Wagner treated with Dr. Seema Dohi, complaining of falling into a grill and injuring her ribs. (Tr. 504). Wagner "denie[d] any other symptoms" at that time. (*Id*.).

In March 2013 Wagner again treated with Dr. Seema Dohi. (Tr. 495). Dr. Dohi noted no complaints regarding neck pain, muscle weakness, joint pain or stiffness, swelling, redness, or arthritis, and also denied numbness, and weakness. (Tr. 495-96, 564).

In April 2013, Wagner underwent an MRI at Port Huron Hospital, apparently pursuant to a breast exam, which revealed a "small syrinx seen at inferior [illegible] vertebral body level within spinal cord" along with "disc herniation [illegible] facing anterior thecal sac at C5-C6 levels." (Tr. 554).

In July 2013, Wagner treated with Dr. Nalini Samuel, who recorded complaints of chronic low back pain resulting from degenerative disc disease, a herniated disc, and scoliosis. (Tr. 588). Dr. Samuel noted that injections "did help" Wagner's pain, but that in recent years her back pain has flared up, presenting particularly in the left leg, and that her arms had begun feeling numb recently. (*Id*.). On neurological examination, Dr. Samuel found Wagner's condition to be unremarkable, noting primarily that she had pain in the lumbar area. (Tr. 589).

13

In September 2013 Wagner underwent another MRI of the lumbar spine, which showed a stable "right paracentral disc bulge or small protrusion," an "abnormal signal along the anterolateral margin of the right thecal sac which could be an artifact." (Tr. 598).

Wagner again treated with Dr. Samuel in September 2013, complaining of pain in the left leg, back, and neck. (Tr. 599). Dr. Samuel diagnosed a lumbar disc bulge and cervical disc protrusions in the form of a syrinx. (*Id*.). An August 2013 EMG study performed by Dr. Samuel showed no abnormalities, but a September 2013 study showed evidence of right ulnar nerve compressive mononeuropathy at the elbow, but with no electrodiagnostic evidence of a radiculopathy in the upper extremities. (Tr. 601-03).

### 2.    Application Reports and Administrative Hearing

### a.    Wagner's Function Report

Wagner completed a function report on November 22, 2011, in which she asserted that her illness prevents her from standing or sitting for longs periods of time due to back and tailbone pain. (Tr. 190). Wagner reported that she cleans the house, does laundry, helps her son get ready for school, vacuums, sweeps, feeds her pets, cleans a chicken coop, mows the lawn, and babysits. (Tr. 191). Wagner's pain interrupted her sleep, causing her to toss and turn all night. (*Id*.). She had no problems with personal care, could prepare complete meals every day. (Tr. 192). While preparing meals could take fifteen to sixty minutes, she experienced pain from standing for too long. (*Id*.). Wagner also split small pieces of wood to prepare for winter. (*Id*.). She traveled outside daily, and could

14

drive a car. (Tr. 193). Likewise she shopped in stores for groceries, but reported doing so only monthly. (*Id*.). Her hobbies included watching television, sewing, crafts, and working in her flower bed. (Tr. 194). She asserted that her conditions caused her to experience neck, tailbone, and back pain, ultimately resulting in a headache. (*Id*.). Wagner reported having problems lifting, bending, standing, walking, and stair climbing. (Tr. 195). Lifting caused her to experience shoulder pain, neck pain, and headaches, sometimes resulting in vomiting. (*Id*.). Wagner reported using a TENS machine and a back brace "all the time." (Tr. 196). In a section for remarks, Wagner wrote that she had "trouble with bending long periods of time," had difficulty "straightening up" her back, difficulty standing and walking, difficulty sitting for long periods, and alleviated her pain by getting up and down throughout the day. (Tr. 197). Wagner appears to have written out a second copy of her function report on the same date, in which she generally duplicated the answers provided in the first function report. (Tr. 198-205).

### b.  Wagner's Testimony at the Administrative Hearing

At the September 10, 2013, hearing before the ALJ, Wagner testified that she lived in a second floor apartment, and climbed approximately twelve steps to reach her dwelling. (Tr. 29). She complained of "[c]hronic pain all the time," which prevented her from sleeping, and caused pain while do "everything," including sitting and standing. (Tr. 32). This pain was located in her neck, back, and left leg. (*Id*.). At the time of the hearing, her pain was at a level of about eight out of ten. (Tr. 33). Wagner stated that her conditions were getting worse because her pain was growing more intense over time. (Tr.

15

34). Wagner was taking only Ultram at the time of the hearing, and was no longer receiving injection therapy from a "Dr. McGee," because he "got arrested," though it appears that the parties were in actuality referencing Dr. Naguib. (*Id*.).

Wagner reported that on an average day she takes care of her two children, cooks, does laundry, and acts as "a homemaker" insofar as her pain permits. (Tr. 34). While her children are at school, she takes care of her dogs. (*Id*.). Wagner stated that she could drive and did the family's shopping, but that her children unloaded groceries from the car. (Tr. 36). Wagner stated that she did not attend any social events. (*Id*.).

In terms of lifting capacity, Wagner stated that she "wouldn't want to pick up any more than ten pounds." (Tr. 36). Wagner also asserted that she had difficulty sitting for long periods of time, and could stand for approximately ten to fifteen minutes, and walk for fifteen to twenty minutes. (*Id*.).

When asked why she was no longer making use of injections and narcotic pain medication other than Ultram, Wagner stated that her new doctor "don't deal with narcotics at all," and that "[s]he don't do injections either." (Tr. 37). When asked how she rests at home, Wagner asserted that she sits in a recliner, but that she still experiences pain when reclining, and that she "just kind of figure[s] out a way to deal with it. (Tr. 38). Wagner stated that she lost her job at a pizza restaurant because of difficulty lifting heavy drink coolers. (*Id*.). Wagner's pain from fibromyalgia "hurt[] all over," and she rated her overall body pain at a seven out of ten. (Tr. 39).

### c.      The VE's Testimony at the Administrative Hearing

16

The ALJ then utilized a VE to determine Wagner's ability to perform work. The ALJ first asked the VE to characterize Wagner's past relevant work. (Tr. 41). The VE found that Wagner's work as a nurse was semi-skilled work performed at the medium level, her work as a cashier was unskilled and light, and her work as a housekeeper was also unskilled and light. (*Id*.). The ALJ then asked the VE a series of hypothetical questions to determine whether Wagner was capable of completing competitive, remunerative work. (Tr. 42). First, he asked the VE to assume a person of identical age, education, and vocational history to Wagner, who could perform light work, who could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, could occasionally stoop, kneel, crouch, crawl, and balance, and who should avoid all exposure to unprotected heights. (*Id*.). The VE testified that such a person could perform Wagner's past work as a housekeeper and cashier. (Tr. 42). The ALJ then inquired whether the hypothetical person could perform those positions if limited to a sedentary level of work; the VE testified that such a restriction would preclude both of those positions. (*Id*.). However, the VE also found that such a person limited to sedentary work could perform the positions of assembler (3,000 jobs in Southeast Michigan), inspector (2,000 jobs), and sorter (2,000 jobs). (Tr. 42-43). The VE also confirmed that a sit-stand option every fifteen minutes which would not put the worker off task more than ten percent of the day would not limit the hypothetical worker's ability to perform any of the aforementioned jobs. (Tr. 43). However, if the hypothetical worker required more than two unscheduled absences per month, extended breaks, or the ability to leave work at

17

unscheduled times, those limitations would preclude all competitive employment. (Tr. 44).

**F.     Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

18

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

> (i)    [D]aily activities;
> (ii)   The location, duration, frequency, and intensity of . . . pain;
> (iii)  Precipitating and aggravating factors;
> (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

21

> (v)   Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.    Analysis

Wagner argues that the ALJ erred in the following ways: 1) Rejecting the opinions of treating physicians without providing the requisite good reasons for doing so; 2) Granting considerable weight to consultative physician Dr. Lazzara's incomplete opinion;

3) Rendering a credibility determination not supported by substantial evidence; 4) Making several errors at Step Four. These arguments will be addressed in turn.

### 1. The ALJ Gave Good Reasons for the Weight Assigned the Opinions of Wagner's Physicians

Wagner first argues that the ALJ erred by granting only minimal weight to the opinions of Drs. Naguib and Samuel without providing good reasons for doing so. (Doc. 17 at 11-17). Wagner also argues that the ALJ erred by providing considerable weight to the opinion of Dr. Lazzara, who acted as a mere consultative physician. (Doc. 17 at 11-12). She asserts that ALJ should have favored the opinions of Drs. Naguib and Samuel given their "superior treatment relationship" with Wagner, and should have favored Dr. Naguib's opinion given his expertise as a neurologist and pain management specialist. (*Id.* at 12).

The ALJ rejected Dr. Naguib's opinions because he found that "the restrictions he has proposed are unsupported by the objective medical evidence, including multiple MRI tests and nerve conduction studies, as well as Dr. Naguib's own findings on the clinical exam (e.g. 5/5 strength)," and because Dr. Naguib's finding that Wagner could stand for only one hour per day and lift less than ten pounds was inconsistent with Wagner's own assertion that she could walk about a mile and lift twenty pounds. (Tr. 17). An ALJ provides "good reasons" for rejecting a treating physician's opinions insofar as he demonstrates that the physician's opinion is inconsistent with other evidence in the record. *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800 (6th Cir. 2004). Said

23

differently, "the more consistent an opinion is with the record as a whole, the more weight we will give that opinion." 20 C.F.R. § 404.1527(d)(4).

By giving "little" weight to Dr. Naguib's opinions, the ALJ concluded that the physician's opinions were somewhat consistent with the other evidence in the record, but were largely inconsistent with that other evidence. This conclusion is well supported. Dr. Naguib performed four EMG studies between 2010 and 2011, each of which revealed no abnormal findings. (Tr. 328, 375, 460, 482). Only one EMG, performed by Dr. Samuel after Wagner left Dr. Naguib's care, revealed abnormal findings of any sort, and that test showed only right ulnar nerve compressive mononeuropathy at the elbow. (Tr. 601-03). A review of the objective medical evidence shows little support for Dr. Naguib's conclusion that Wagner suffered from neuropathy.

Likewise, Wagner's MRI scans showed only signs of mild to moderate impairment. Wagner's 2004 MRI showed evidence of thoracic radiculopathy, scoliosis, and degenerative disc disease. (Tr. 286). Wagner's MRI scans in April and September of 2013 showed only a "small syrinx at the inferior . . . vertebral body level," "disc herniation . . . at [the] C5-C6 levels," a stable "right paracentral disc bulge or small protrusion," and an "abnormal sign along the anterolateral margin of the right thecal sac." (Tr. 554, 598). These relatively limited findings seem wholly inconsistent with Dr. Naguib's laundry list of diagnosed conditions, including low back pain syndrome, spondylosis, degenerative disc disease, radiculopathy, muscle spasms, joint osteoarthritis, facet arthrosis, disc bulges at L5/S1, L4/L5, chronic widespread fibromyalgic myofascial

24

pain syndrome, bilateral lower extremity tingling, numbness, paresthesia with bilateral upper extremity tingling, trigger point tenderness, tenderness on palpation of the thoracic and cervical area, migraines, occipital neuritis, confusion, hard calcification at T11/12, multiple widespread pain syndromes, chronic neck pain, cervicalgia, bilateral sacroiliitis, insomnia, and progressive cervical pain. (Tr. 253, 294, 299, 308, 348, 368-75, 426, 526). Upon review of Dr. Naguib's records, it is unclear how he diagnosed this tremendous number of disorders, or what methods he used to diagnose them. In any case it is clear that the relatively minor maladies noted in Wagner's EMG and MRI scans could not rationally support all of Dr. Naguib's diagnoses.

Furthermore, as the ALJ points out, one would expect to see a far greater level of functional limitation if Wagner actually suffered from the immense number of conditions found by Dr. Naguib. (Tr. 17). Dr. Naguib's May 2012 RFC assessment was that Wagner could "frequently lift up to ten pounds" and could "occasionally lift twenty pounds." (Tr. 251). Dr. Naguib asserted in his January 2013 RFC assessment that Wagner could walk less than one block, sit or stand for fifteen minutes, and could do those activities for one hour per day. (Tr. 253). She could lift ten pounds occasionally but never more than ten pounds. (*Id*.). Yet in September 2013, Dr. Naguib wrote that Wagner could only walk half a block, could sit for three hours per day, could stand or walk for four hours per day, would need breaks every fifteen to twenty minutes, and could lift up to twenty pounds occasionally. (Tr. 591). These assessments were thus inconsistent with one another, did not show a progressive decline in Wagner's health, and state that Wagner could lift up to

twenty pounds in 2012 and late 2013, a substantial amount for someone who allegedly suffers from well over a dozen maladies of the back, neck, leg, and spine.

Dr. Naguib's assessments are also inconsistent with Wagner's own asserted abilities. Wagner reported in 2011 that she could take care of her children, babysit, sweep, vacuum, take care of her pets, clean a chicken coop, mow the lawn, prepare complex meals, split firewood, shop for groceries, drive, sew, watch television, and work in her flower bed. (Tr. 192-93). It is evident on its face that Wagner's self-professed abilities are inconsistent with Dr. Naguib's list of diagnosed conditions. It is nigh unfathomable that someone with extreme back pain resulting from osteoarthritis, arthrosis, bulging discs, fibromyalgiac myofascial pain, paresthesia, and radiculopathy, among other conditions, would voluntarily chop wood, muck out a chicken coop, mow a lawn, or perhaps even regularly sweep and vacuum. The necessary conclusion is either that Dr. Naguib over-diagnosed Wagner, or that Wagner's conditions were remarkably well treated by her conservative therapy. Yet the record makes clear that this second option is also untenable.

Wagner ceased treating with Dr. Naguib in 2013, and in doing so also ceased the use of epidural steroid pain relieving injections, and scaled back her medication to a single narcotic pain reliever, Ultram, also known as Tramadol. (Tr. 37). Wagner testified at the hearing that her new physician, "don't deal with narcotics at all," and that "[s]he don't do injections either." (*Id*.). If Wagner's pain was really as disabling as she and Dr. Naguib suggest, one would expect that she would seek out a new physician who was

26

willing and able to provide pain relieving injections. This is particularly true given that Wagner regularly reported that these injections relieved half of her pain. (Tr. 302, 322, 353-54, 361). The necessary conclusion is that Wagner's symptoms are not as severe as alleged, further undercutting Dr. Naguib's bleak evaluation of Wagner's condition.

Furthermore, Dr. Naguib's findings are not well supported by the findings of other physicians in the record. While it is true that Dr. Dohi diagnosed Wagner with chronic lower back pain and left-sided spinal radiculopathy in 2009, Wagner apparently had no complaints about her back, neck, leg, or spine pain during visits in 2010, 2012, or 2013. (Tr. 495, 504, 507). Dr. Samuel noted complaints of chronic back pain, leg pain, and some arm numbness in 2013, but on objective examination found that Wagner appeared largely unremarkable, showing only a "right paracentral disc bulge or small protrusion," and an "abnormal signal along the anterolateral margin." (Tr. 598). Dr. Lazzara found that Wagner's pain was more likely to be of an "arthritic and myofascial" nature than from her disc herniations, and that she could complete all diagnostic tasks asked of her, including bending and hopping on the examination table, and found that she suffered from only a mild degree of impairment. (Tr. 246).

Wagner also briefly suggests that the ALJ erred by way of failing to discuss Dr. Naguib's specialized expertise and treating relationship, and by failing to discuss the bulk of Dr. Naguib's findings, which support a finding of disability. (Doc. 17 at 14). Dr. Naguib's treating relationship and expertise as a neurologist is irrelevant where his opinions do not comport with the other evidence of record. Furthermore, the ALJ noted

27

that Dr. Naguib was a neurologist, and thus clearly considered that expertise. (Tr. 16). As to the second argument, an "ALJ need not discuss every piece of evidence in the record for his decision to stand." *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). The ALJ discussed Dr. Naguib's opinions and findings with sufficient particularity to establish that his findings were inconsistent with the other evidence in the record.

In sum, the ALJ presented good reasons to doubt the validity of Dr. Naguib's opinions, and thus did not err by giving little weight to that physician's opinions.

### 2. *The ALJ Did Not Err by Granting Considerable Weight to Dr. Lazzara's Opinion*

Wagner next argues that the ALJ erred by "relying almost solely on the opinion of Dr. Lazzara because he did not provide a full functional assessment" and because the ALJ's RFC finding was more restrictive than the one suggested by Dr. Lazzara. (Doc. 17 at 17). An ALJ has no obligation to conform his RFC finding to a physician's RFC assessment; as the Sixth Circuit has repeatedly noted, such a requirement "would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd v. Comm'r of Soc. Sec.*, 531 F. Appx 719, 728 (6th Cir. 2013) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996)). Instead, the ALJ's RFC finding must be supported by substantial evidence, and thus must be consistent with the record as a whole. *See*

28

*Kendrick v. Comm'r of Soc. Sec.*, No. 12-CV-15388, 2014 WL 1260665, at *11 (E.D. Mich. Mar. 27, 2014); *see also Wills v. Sec'y, Health & Human Servs.*, 802 F.2d 870, 873 (6th Cir. 1986) ("The existence of substantial evidence to support the Secretary's finding must be reflected by the record as a whole."). Because the ALJ has the power to craft his or her RFC finding based on the record as a whole, and is not tied to the opinion of any physician, it follows that the ALJ may craft a RFC finding which is more restrictive than that issued by any particular physician.

### 3.   *The ALJ's Credibility Determination is Supported by Substantial Evidence*

Wagner also asserts that the ALJ erred by finding that her complaints of pain were not entirely credible. (Doc. 17 at 18-21). Wagner notes that she received over a dozen pain relieving epidural injections over the course of her three years of treatment with Dr. Naguib, indicating that she received more than "mere routine care," and suggesting "a pattern of chronic, intractable pain." (*Id.* at 18). Judges in this district have regularly found that epidural pain relieving injections are conservative therapy. *See, e.g.*, *Dimarzio v. Comm'r of Soc. Sec.*, No. 11-15635, 2013 WL 6163637, at *18 (E.D. Mich. Nov. 20, 2013); *Cobb v. Comm'r of Soc. Sec.*, No. CIV.A. 10-10023, 2010 WL 6243315, at *2 (E.D. Mich. Dec. 13, 2010) report and recommendation adopted, No. 2:10-CV-10023, 2011 WL 1085538 (E.D. Mich. Mar. 22, 2011). More persuasive, however, is Wagner's failure to seek out further epidural steroid injections after she ceased treating with Dr. Naguib. As noted above, Wagner testified that she stopped receiving this effective

therapy after Dr. Naguib was arrested, allegedly because her new treating physician refused to provide either injections or narcotic pain relief medication. (Tr. 37). Particularly where Wagner asserts that her condition is severely painful and has deteriorated over time (Tr. 34), it is difficult to believe that she would not attempt to find an alternate physician who offered epidural steroid injections.

Likewise, the Court is loath to accept Wagner's assertion that her condition has deteriorated (Tr. 34) where even Dr. Naguib, who evinced a particularly dire view of Wagner's health, and who diagnosed Wagner with a lengthy list of disorders, crafted RFC assessments that suggest her condition actually improved over time in certain respects. Dr. Naguib found that Wagner's ability to lift weight increased from ten pounds to twenty pounds between his January 2013 and September 2013 RFC assessments. (Tr. 253, 591). Similarly, he found that Wagner was able to stand or walk for one hour per day in January 2013, but that she could stand or walk for four hours per day in September 2013. (*Id.*). The Court also notes that Wagner asserted that she could only lift less than ten pounds at the hearing before the ALJ, which is directly contradicted by Dr. Naguib's assessment, rendered in the same month, that she could lift up to twenty pounds. (Tr. 41, 591).

Wagner also argues that her ability to perform some household tasks does not mean that she is capable of performing full time work. (Tr. 17 at 20-21). Wagner points to case law indicating that benefits claimants need not "vegetate in a dark room" to be found disabled. *Allen v. Comm'r of Soc. Sec.*, No. 1:14-CV-86, 2015 WL 1119755, at *6

30

(W.D. Mich. Mar. 11, 2015) (quotation omitted). This point is well taken, but not applicable to Wagner's particular situation. The ALJ did not find that Wagner was capable of performing competitive, remunerative work because she was capable of cutting firewood, mowing the lawn, caring for dogs and children, babysitting, cooking, and other strenuous activities, but instead properly used these activities to impugn Wagner's credibility regarding the allegedly severe pain she experiences. (Tr. 18). The ALJ properly considered these daily activities in conjunction with the other evidence of record, and concluded that Wagner's credibility was suspect. *See Evans v. Astrue*, No. 09-10184, 2009 WL 4506435, at *5 (E.D. Mich. Dec. 1, 2009) (holding that an ALJ may consider a claimant's daily activities in conjunction with other evidence of record to conclude that the claimant is less than credible). Wagner is not vegetating in a dark room, but rather is, by her own admission, living a relatively restriction-free life as a homemaker, and engages in a wide variety of taxing physical activities. The physician whose opinions most favor her claim of disability found that her condition actually improved in terms of her ability to lift, walk, and stand. Wagner's pain was apparently sufficiently mitigated by late 2013 that she no longer felt motivated to seek out pain relieving injections. On the whole, there are numerous, significant reasons to doubt Wagner's credibility, and the ALJ's credibility determination is supported by substantial evidence.

### 4.     *The ALJ Did Not Err at Step Four*

Finally, Wagner argues that the ALJ erred by making an incorrect finding at Step Four of the five-step sequential analysis. (Doc. 17 at 21-22). Wagner notes that the ALJ found that she could return to her past work as a housekeeper, yet there is insufficient evidence that she performed this work at a level necessary for it to be considered substantial gainful activity. (*Id*.). Even assuming that the ALJ erred in finding that Wagner could return to her past work as a housekeeper, he also found that she could return to her past work as a cashier. (Tr. 19). Once the ALJ has identified a single past relevant job to which the claimant can return, the claimant may be found not disabled. *Cowles v. Colvin*, No. 1:15CV105, 2016 WL 527063, at *8 (M.D.N.C. Feb. 9, 2016) ("The ALJ's step four finding can permissibly rest on a finding that Plaintiff can return to a single, former job, so long as that job qualifies as 'past relevant work.'") (quoting 20 C.F.R. § 404.1560(b)(3)). Wagner has identified no compelling reason why she is unable to return to her past relevant work as a cashier, thus the ALJ's Step Four finding stands. Furthermore, while the ALJ did not incorporate this testimony into his decision, the VE identified several positions which exist in substantial numbers in Southeast Michigan which Wagner could perform, and could have also found her not disabled on that basis. (Tr. 43).

Wagner also argues that the ALJ erred by requesting that the VE consider hypothetical workers whose limitations do not comport with those she alleged. (Doc. 17 at 21-23). The Court has already thoroughly examined the ALJ's findings regarding Wagner's credibility and Wagner's treating physicians, and has concluded that the ALJ's

32

RFC finding was supported by substantial evidence. An ALJ is not obligated to include in his or her hypothetical questions to the VE limitations which are found not to be credible. *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001).

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Wagner's Motion for Summary Judgment (Doc. 17) be **DENIED**, the Commissioner's Motion (Doc. 18) be **GRANTED**, and that this case be **AFFIRMED**.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  March 22, 2016                    S/ Patricia T. Morris
                                         Patricia T. Morris
                                         United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.


Date: March 22, 2016                     By s/Kristen Krawczyk
                                         Case Manager